**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GLOBALFOUNDRIES U.S. INC.   ) | |
| ) | C.A. No. _____ |
| Plaintiff,    ) | |
| ) | |
| v.    ) | |
| ) | **JURY TRIAL DEMANDED** |
| XILINX, INC. and    ) | |
| MOUSER ELECTRONICS, INC.   ) | |
| ) | |
| Defendants.    ) | |
| ) | |
| ) | |
| ) | |

**COMPLAINT**

Plaintiff Globalfoundries U.S. Inc. ("Globalfoundries" or "Plaintiff") brings this patent infringement action against Defendants Xilinx, Inc. ("Xilinx") and Mouser Electronics, Inc. ("Mouser") (collectively, "Defendants") as follows:

**NATURE OF THE ACTION**

1. This is a civil action for infringement of United States Patent Nos. 8,912,603 ("'603 patent"), 7,750,418 ("'418 patent"), and 8,936,986 ("'986 patent") (collectively, the "Asserted Patents") under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

**THE PARTIES**

2. Plaintiff Globalfoundries U.S. Inc. is a Delaware corporation with its principal place of business at 2600 Great America Way, Santa Clara, California 95054.

3. Defendant Xilinx, Inc. is a Delaware corporation with its principal place of business at 2100 Logic Drive, San Jose, California 95124.

1

4.      Defendant Mouser Electronics, Inc. is a Delaware corporation with its principal place of business at 1000 North Main Street, Mansfield, Texas 76063.

**JURISDICTION AND VENUE**

5.      The Court has subject matter jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1338(a) and the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

6.      The Court has personal jurisdiction over Defendant Xilinx consistent with the requirements of the Due Process Clause of the United States Constitution and the Delaware Long Arm Statute.   Xilinx is incorporated in Delaware.   On information and belief, Xilinx has regularly and systematically transacted business in Delaware, directly or through subsidiaries or intermediaries, and/or committed acts of patent infringement in Delaware as alleged more particularly below.   Xilinx has also placed integrated circuits using Taiwan Semiconductor Manufacturing Company Ltd. ("TSMC") 28 nanometer and smaller technology[1] and products containing these integrated circuits, including Xilinx's field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs") manufactured using TSMC's 28 nanometer and smaller technology (the "Accused Products") into the stream of commerce by shipping Accused

---

[1] TSMC 28 nanometer and smaller technology includes TSMC's 28 nanometer technology (including TSMC's High-k Metal Gate gate-last technology and high-performance compact technology) ("28 Nanometer"), TSMC's 22 nanometer technology (including TSMC's 22 nanometer ultra-low power, 22 nanometer ultra-low leakage, and 22 nanometer ultra-low leakage static random access memory technologies) ("22 Nanometer"), TSMC's 20 nanometer technology ("20 Nanometer"), TSMC's 16/12 nanometer technology (including TSMC's 16 nanometer Fin Field Effect Transistor ("FinFET") process, 16 nanometer FinFET Plus process, 16 nanometer FinFET Compact Technology, and 12 nanometer FinFET Compact Technology) ("16 Nanometer"), TSMC's 10 nanometer technology (including TSMC's 10 nanometer FinFET process) ("10 Nanometer"), TSMC's 7 nanometer technology (including TSMC's 7 nanometer FinFET process) ("7 Nanometer").  Globalfoundries reserves the right to accuse any forthcoming TSMC technology, such as TSMC's 7 nanometer extreme ultraviolet lithography technology and TSMC's 5 nanometer technology.

Products into Delaware, shipping Accused Products knowing that those products would be shipped into Delaware, and/or shipping Accused Products knowing that these Accused Products would be incorporated into other Accused Products that would be shipped into Delaware. Xilinx also interacts with customers who sell the Accused Products into Delaware, knowing that these customers will sell the Accused Products into Delaware, either directly or through intermediaries. The Court therefore has both general and specific personal jurisdiction over Xilinx.

7.     The Court has personal jurisdiction over Defendant Mouser consistent with the requirements of the Due Process Clause of the United States Constitution and the Delaware Long Arm Statute. Mouser is incorporated in Delaware. On information and belief, Mouser has regularly and systematically transacted business in Delaware, directly or through subsidiaries or intermediaries, and/or committed acts of patent infringement in Delaware as alleged more particularly below. Mouser has also placed Accused Products into the stream of commerce by shipping Accused Products into Delaware. The Court therefore has both general and specific personal jurisdiction over Mouser.

8.     With respect to Defendant Xilinx, venue is proper in this district under 28 U.S.C. § 1400(b) because Xilinx resides in this district.

9.     With respect to Defendant Mouser, venue is proper in this district under 28 U.S.C. § 1400(b) because Mouser resides in this district.

**JOINDER**

10.     Joinder of Defendants is proper under 35 U.S.C. § 299. The allegations of patent infringement contained herein arise out of the same series of transactions or occurrences relating to the importing into the United States and/or making, using, selling, or offering for sale within the United States, the same Accused Products, including Xilinx's field programmable gate

3

arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs") manufactured using TSMC's 28 nanometer and smaller technology.

11.     Common questions of fact relating to Defendants' infringement will arise in this action.  For example, common questions of fact concerning Xilinx's and Mouser's infringement of the '603, '418, and '986 patents will arise in this action.  Additionally, common questions of fact as to profits and revenues derived by Xilinx and Mouser will arise, as well as common questions of fact related to Globalfoundries' damages for the same.  On information and belief, common questions of fact will also exist with regard to Xilinx's and Mouser's defenses in this litigation, if any.

## FACTUAL BACKGROUND

12.     Globalfoundries is a U.S. company with manufacturing facilities that use and develop some of the world's most advanced semiconductor devices available today.  Building on IBM's world-class semiconductor technology heritage, Globalfoundries, the acquirer of IBM's semiconductor division, has been accredited as a Category 1A Microelectronics Trusted Source for fabrication, design, and testing of microelectronics by the U.S. Department of Defense (DOD).[2]  Globalfoundries' East Fishkill, New York facility is currently the most advanced Trusted Foundry, and as such is the only facility of its kind that can provide certain advanced circuits to satisfy the DOD's requirements.  As the second-largest foundry in the world and the only advanced Trusted Foundry, Globalfoundries is uniquely equipped to efficiently and quickly meet the DOD's advanced and highly classified manufacturing and production needs—and is also equipped to do the same for its private-sector clients.

---

[2] "Aerospace and Defense," https://www.globalfoundries.com/market-solutions/aerospace-and-defense.

13.     Globalfoundries is the most advanced pure-play foundry in the U.S. and Europe, and employs thousands of people in the U.S. and worldwide.  While other companies were abandoning semiconductor manufacturing in the U.S., Globalfoundries bucked this trend by investing billions of dollars on advanced technology and research in the United States. Globalfoundries originated from another leading U.S. semiconductor company, Advanced Micro Devices' semiconductor manufacturing arm in 2009 and expanded globally through acquisition and organic investment.  Its largest expenditure by far is its $15 billion organic U.S. investment in its leading-edge, 300 acre facility known as Fab 8 in Malta, New York.  Globalfoundries broke ground for that state of the art facility in 2009 and produces leading edge technology from that location to customers worldwide.  A major U.S. acquisition took place in 2015 when Globalfoundries acquired IBM's microelectronics facilities and personnel in Burlington, Vermont and East Fishkill, New York—facilities that became Fab 9 and Fab 10, respectively. Globalfoundries acquired not just IBM's facilities and personnel, but also the fruits of IBM's decades of industry-leading investment in U.S. semiconductor fabrication capacity and technology.   Specifically, Globalfoundries obtained 16,000 IBM patents and applications (including the '418 patent asserted in this action); numerous world-class technologists; decades of experience and expertise in semiconductor development, device expertise, design, and manufacturing;  and an expanded manufacturing footprint.   The acquisition cemented Globalfoundries' role as a global leader in world-class semiconductor manufacturing and advanced process technologies.[3]

---

[3]    "Globalfoundries   Completes   Acquisition   of   IBM   Microelectronics   Business," https://www.globalfoundries.com/news-events/press-releases/globalfoundries-completes-acquisition-of-ibm-microelectronics-business.

14.     Globalfoundries' U.S. manufacturing facilities in Burlington, Vermont; East Fishkill, New York; and Malta, New York use and develop some of the most advanced process nodes and differentiated technologies (inclusive of its 12/14nm FinFET, RF and Silicon Photonics technology solutions) available today.  Fab 8 is a leading fabrication facility for advanced manufacturing in the U.S., with 40,875 square meters of cleanroom space and continued expansion, and over 3,000 total employees as of June 2019.  The current capital investment for the Fab 8 campus stands at more than $15 billion, making Fab 8 the largest public-private sector industrial investment in New York State's history.  The significance of this investment and its importance to advanced manufacturing in the U.S. have been recognized by top government officials, including by the President of the U.S. during a 2012 visit to New York hosted in part by Globalfoundries.[4]

15.     Globalfoundries' investment from the Champlain Valley through the Hudson Valley makes it the spine of the Northeast's Tech Valley.  Three out of Globalfoundries' five fabs are in the U.S., but investment does not stop at its manufacturing capacity. Globalfoundries' manufacturing footprint is supported by facilities for research, development, sales, and design enablement located near hubs of semiconductor activity, including in Santa Clara, California; Dallas, Texas; Austin, Texas; Rochester, Minnesota; Endicott, New York; and Raleigh, North Carolina.  Of its 16,000 employees worldwide, approximately 7,200 are employed in the U.S.

16.     However, the manufacturer of the Xilinx products accused of infringing in this action, TSMC, has taken a different approach and has decided to simply use Globalfoundries'

---

[4]  "Globalfoundries Welcomes President Barack Obama to NY's Capital Region," https://blog.globalfoundries.com/globalfoundries-welcomes-president-barack-obama-to-nys-capital-region/.

patented inventions without payment or permission.   TSMC is a competing semiconductor foundry with manufacturing facilities located primarily in Hsinchu, Taiwan.   TSMC has recently expressed an interest in building a new manufacturing facility in the U.S., but has not reported any tangible steps towards implementing its ostensible interest.   In contrast, TSMC completed building the most advanced manufacturing facility of its kind in mainland China last year.   By bringing advanced 16nm FinFet to China, TSMC has positioned itself to benefit further from the shift in global supply chains out of the U.S. and Europe into Greater China.   TSMC develops, manufactures, imports, and sells for importation into the U.S. semiconductor devices, including to the Defendants.   But TSMC does these things on the back of Globalfoundries, using Globalfoundries' patented technologies to make its products.   Indeed, although its infringing chips have flooded the U.S. market, it appears that TSMC has attempted to avoid being subject to patent infringement allegations in the U.S. through creative legal and tax structuring.   As set forth below, the Accused Products incorporate, without any license from Globalfoundries, many technologies developed by Globalfoundries and protected by patents owned by Globalfoundries. TSMC's, and/or its customers', importation of infringing articles into the U.S. from Greater China and elsewhere abroad directly harms Globalfoundries and its billions in U.S. investments in manufacturing.   Globalfoundries respectfully seeks relief from this Court for Defendants' infringement.

## THE ASSERTED PATENTS

17.    The '603 patent is entitled "Semiconductor device with stressed fin sections," and issued on December 16, 2014, to inventors Scott Luning and Frank Scott Johnson. Globalfoundries owns the entire right, title, and interest in and to the '603 patent.   A copy of the '603 patent is attached to this Complaint as Exhibit A.

18.     The '418 patent is entitled "Introduction of metal impurity to change workfunction of conductive electrodes," and issued on July 6, 2010 to inventors Michael P. Chudzik, Bruce B. Doris, Supratik Guha, Rajarao Jammy, Vijay Narayanan, Yun Y. Wang, and Keith Kwong Hon Wong.  Globalfoundries owns the entire right, title, and interest in and to the '418 patent.  A copy of the '418 patent is attached to this Complaint as Exhibit B.

19.     The '986 patent is entitled "Methods of forming finfet devices with a shared gate structure," and issued on January 20, 2015 to inventors Andy C. Wei and Dae Geun Yang. Globalfoundries owns the entire right, title, and interest in and to the '986 patent.  A copy of the '986 patent is attached to this Complaint as Exhibit C.

## CLAIMS FOR PATENT INFRINGEMENT

20.     The allegations provided below are exemplary and without prejudice to Globalfoundries' infringement contentions.  In providing these allegations, Globalfoundries does not convey or imply any particular claim constructions or the precise scope of the claims. Globalfoundries' claim construction contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order and local rules.

21.     As detailed below, each element of at least one claim of each of the Asserted Patents is literally present in the Accused Products, or is literally practiced by the process through which each of the Accused Products is made.  To the extent that any element is not literally present or practiced, each such element is present or practiced under the doctrine of equivalents.

## COUNT I
## INFRINGEMENT OF THE '603 PATENT

22.     Globalfoundries incorporates by reference the allegations set forth in paragraphs 1 through 21 as though fully set forth herein.

23.     On information and belief, Xilinx has directly infringed and continues to infringe and/or has induced infringement of one or more claims of the '603 patent, including at least claim 15, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States without authority or license, integrated circuits manufactured by TSMC using, for example, TSMC's 16 Nanometer technology and products containing these integrated circuits (collectively, the "'603 Accused Products"), in violation of 35 U.S.C. § 271.   The '603 Accused Products include at least field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs"), such as the Xilinx XCKU3P and XCKU15P families of FPGAs, and other Kintex UltraScale+ FPGAs, fabricated using, for example, TSMC's 16 Nanometer process.

24.     On information and belief, Xilinx has directly infringed and continues to infringe one or more claims of the '603 patent, including at least claim 15, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States, without authority or license, '603 Accused Products, in violation of 35 U.S.C. § 271(a).   On information and belief, Xilinx imports '603 Accused Products into the United States for sales and distribution to customers located in the United States.   On information and belief, Xilinx sells the '603 Accused Products in the United States.   For example, Xilinx provides direct sales through at least its bare die program and sells directly to original equipment manufacturers and electronic manufacturing service providers.   On information and belief, these direct sales include sales of '603 Accused Products in the United States.   On information and belief, Xilinx offers the '603 Accused Products for sale in the United States.   For example, Xilinx engages in sales, marketing, and contracting activity in the United

States and/or with United States offices of its customers.   In particular, Xilinx has sales representatives in at least 47 states and sales offices throughout the United States.

25.     The '603 Accused Products meet all the limitations of at least claim 15 of the '603 patent.   Specifically, claim 15 of the '603 patent claims a semiconductor device comprising: a semiconductor fin extending along a first direction and having an upper surface interrupted by gaps to form discontinuous upper surface segments, wherein each upper surface segment ends at a respective first end sidewall and a respective second end side wall, and wherein each gap is bounded in the first direction by a selected first end sidewall and an adjacent second end sidewall; and a stress/strain inducing material at least partially filling the gaps and in contact with each second end sidewall and each first end sidewall.

26.     The '603 Accused Products are semiconductor devices.   Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process.

27.     The '603 Accused Products have a semiconductor fin extending along a first direction and having an upper surface interrupted by gaps to form discontinuous upper surface segments, wherein each upper surface segment ends at a respective first end sidewall and a respective second end side wall, and wherein each gap is bounded in the first direction by a selected first end sidewall and an adjacent second end sidewall.   Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that the circuit includes fins extending along a first direction and having an upper surface interrupted by gaps to form discontinuous upper surface segments, wherein each upper surface segment ends at a respective first end sidewall and a respective second end side wall, and wherein each gap is bounded in the first direction by a selected first end sidewall and an adjacent second end sidewall.

28.     The '603 Accused Products have a stress/strain inducing material at least partially filling the gaps and in contact with each second end sidewall and each first end sidewall.  Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process such that, for example, a SiGe epitaxial layer for embedded strain technology at least partially fills the gaps and is in contact with each second end sidewall and each first end sidewall.

29.     On information and belief, Xilinx actively, knowingly, and intentionally induces infringement of one or more claims of the '603 patent under 35 U.S.C. § 271(b) by actively encouraging others to import into the United States, and/or make, use, sell, and/or offer to sell in the United States, '603 Accused Products or products containing the infringing semiconductor components of the '603 Accused Products.  For example, Xilinx actively promotes the sale, use, and importation of the '603 Accused Products in marketing materials, technical specifications, data sheets, web pages on its website (e.g., www.xilinx.com), press releases, training tutorials, development and design tools, user manuals, and developer forums as well as at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES") and Xilinx Development Forum) and through its sales and distribution channels that encourage infringing uses, sales, offers to sell, and importation of the '603 Accused Products.  As another example, Xilinx representatives travel to customer sites in the United States for sales and support activity that includes working with customers to facilitate these customers' infringing testing, marketing, importation, and sales activity.  On information and belief, Xilinx supplies customers with '603 Accused Products so that they may be used, sold, or offered for sale by those customers.  For example, Xilinx provides direct sales to original equipment manufacturers and electronic manufacturing service providers.  On information and belief, these direct sales include sales to

customers in the United States.  Certain Xilinx semiconductor components are compatible with standards specific to the United States such as Code Division Multiple Access ("CDMA") wireless standards, required primarily for compatibility with major carriers in the United States. In 2018, 2017, and 2016, Xilinx generated more net revenue from the United States than any other country.  Xilinx additionally provides a wide range of technical support to customers, including product-specific solution centers and customer forums.  Xilinx also promotes, publicly on its website, uses of the '603 Accused Products by customers in the United States.

30.     By at least August 26, 2019, Globalfoundries disclosed, by sending a letter and filing this Complaint, the existence of the '603 patent and identified at least some of Xilinx's and others' activities that infringe the '603 patent.  Thus, based on this disclosure, Xilinx had knowledge of the '603 patent and that its activities infringe the '603 patent since at least August 26, 2019.  Based on Globalfoundries' disclosures, Xilinx has also known or should have known since at least August 26, 2019 that its customers, distributors, and other purchasers of the '603 Accused Products are infringing the '603 patent at least because Xilinx has known that it is infringing the '603 patent.

31.     Other entities directly infringe the '603 patent by making, using, offering to sell, and/or selling the '603 Accused Products in the United States and by importing the '603 Accused Products into the United States.  For example, and as alleged more particularly below, Avnet, Inc. and Mouser have infringed and continue to infringe one or more claims of the '603 patent, including at least claim 15, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '603 Accused Products.

32.     On information and belief, Mouser has infringed and continues to infringe one or more claims of the '603 patent, including at least claim 15, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '603 Accused Products.  On information and belief, Mouser imports '603 Accused Products into the United States for sales and distribution to customers located in the United States, for example, to its Texas location for shipping and distribution throughout the United States.  On information and belief, Mouser sells the '603 Accused Products in the United States.  For example, Mouser sells '603 Accused Products through its website www.mouser.com.  On information and belief, Mouser offers the '603 Accused Products for sale in the United States.  For example, Mouser engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.  In particular, Mouser has at least four sales branches across the United States.  Mouser also widely publicizes its distributor relationship with Xilinx, including maintaining stock of '603 Accused Products for shipping throughout the United States.

33.     Globalfoundries has suffered and continues to suffer damages as a result of Defendants' infringement of the '603 patent.

34.     Defendants' continuing acts of infringement are a basis of consumer demand for the '603 Accused Products.   Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to Globalfoundries, for which Globalfoundries has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.  The hardships that an injunction would impose are less than those faced by Globalfoundries should an injunction not issue.  The public interest would be served by issuance of an injunction.

## COUNT II
## INFRINGEMENT OF THE '418 PATENT

35.     Globalfoundries incorporates by reference the allegations set forth in paragraphs 1 through 34 as though fully set forth herein.

36.     On information and belief, Xilinx has directly infringed and continues to infringe and/or has induced infringement of one or more claims of the '418 patent, including at least claim 27, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling and/or offering to sell in the United States without authority or license, integrated circuits manufactured by TSMC using, for example, TSMC's 28 Nanometer or 16 Nanometer technology and products containing these integrated circuits (collectively, the "'418 Accused Products"), in violation of 35 U.S.C. § 271.  The '418 Accused Products include at least field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs"), such as the Xilinx XCKU3P and XCKU15P families of FPGAs, and other Kintex UltraScale+ FPGAs, fabricated using, for example, TSMC's 28 Nanometer or 16 Nanometer process.

37.     On information and belief, Xilinx has directly infringed and continues to infringe one or more claims of the '418 patent, including at least claim 27, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering for sale in the United States, without authority or license, '418 Accused Products, in violation of 35 U.S.C. § 271(a) and (g).  On information and belief, Xilinx imports '418 Accused Products into the United States for sales and distribution to customers located in the United States.  On information and belief, Xilinx sells the '418 Accused Products in the United States.  For example, Xilinx provides direct sales through at least its bare die program and sells directly to

original equipment manufacturers and electronic manufacturing service providers.   On information and belief, these direct sales include sales of '418 Accused Products in the United States.  On information and belief, Xilinx offers the '418 Accused Products for sale in the United States.  For example, Xilinx engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.   In particular, Xilinx has sales representatives in at least 47 states and sales offices throughout the United States.

38.     The '418 Accused Products are manufactured by a process including all of the limitations of at least claim 27 of the '418 patent.  Specifically, claim 27 of the '418 patent claims a method of changing workfunction of a conductive stack comprising: providing a material stack that comprises a dielectric having a dielectric constant of greater than silicon dioxide, a metal-containing material located above said dielectric, and a conductive electrode located directly on an upper surface of said metal-containing material; and introducing at least one workfunction altering metal impurity into said metal-containing material wherein said at least one workfunction altering metal impurity is introduced during forming of a metal impurity containing layer or after formation of a layer containing said metal-containing material.

39.     The '418 Accused Products are made by a method of changing workfunction of a conductive stack.  TSMC's manufacture of each of the '418 Accused Products involves changing workfunction for at least some conductive stacks in the product.

40.     During the manufacture of the '418 Accused Products, a material stack is provided that comprises a dielectric having a dielectric constant of greater than silicon dioxide, a metal-containing material including located above said dielectric, and a conductive electrode located directly on an upper surface of said metal-containing material.  TSMC's manufacture of at least one p-type FET in each of the '418 Accused Products includes creating a material stack

that comprises HfO (a dielectric having a dielectric constant of greater than silicon dioxide), interfacial TiN (a metal-containing material located above said dielectric), and TiN WF (a conductive electrode located directly on an upper surface of said metal-containing material).

41.     During the manufacture of the '418 Accused Products, at least one workfunction altering metal impurity is introduced into said metal-containing material wherein said at least one workfunction altering metal impurity is introduced during forming of a metal impurity containing layer or after formation of a layer containing said metal-containing material.  TSMC's manufacture of at least one p-type FET in each of the '418 Accused Products includes introducing TiAlCOClF fill (at least one workfunction altering metal impurity) into said metal-containing material wherein said at least one workfunction altering metal impurity is introduced after formation of a layer containing said metal-containing material.

42.     On information and belief, the '418 Accused Products are neither materially changed by subsequent processes nor become trivial and nonessential components of another product.

43.     On information and belief, Xilinx actively, knowingly, and intentionally induces infringement of one or more claims of the '418 patent under 35 U.S.C. § 271(b) by actively encouraging others to import into the United States, and/or make, use, sell, and/or offer to sell in the United States, '418 Accused Products or products containing the infringing semiconductor components of the '418 Accused Products.  For example, Xilinx actively promotes the sale, use, and importation of the '418 Accused Products in marketing materials, technical specifications, data sheets, web pages on its website (e.g., www.xilinx.com), press releases, training tutorials, development and design tools, user manuals, and developer forums as well as at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES") and Xilinx

Development Forum) and through its sales and distribution channels that encourage infringing uses, sales, offers to sell, and importation of the '418 Accused Products. As another example, Xilinx representatives travel to customer sites in the United States for sales and support activity that includes working with customers to facilitate these customers' infringing testing, marketing, importation, and sales activity. On information and belief, Xilinx supplies customers with '418 Accused Products so that they may be used, sold, or offered for sale by those customers. For example, Xilinx provides direct sales to original equipment manufacturers and electronic manufacturing service providers. On information and belief, these direct sales include sales to customers in the United States. Certain Xilinx semiconductor components are compatible with standards specific to the United States such as Code Division Multiple Access ("CDMA") wireless standards, required primarily for compatibility with major carriers in the United States. In 2018, 2017, and 2016, Xilinx generated more net revenue from the United States than any other country. Xilinx additionally provides a wide range of technical support to customers, including product-specific solution centers and customer forums. Xilinx also promotes, publicly on its website, uses of the '418 Accused Products by customers in the United States.

44. By at least August 26, 2019, Globalfoundries disclosed, by sending a letter and filing this Complaint, the existence of the '418 patent and identified at least some of Xilinx's and others' activities that infringe the '418 patent. Thus, based on this disclosure, Xilinx had knowledge of the '418 patent and that its activities infringe the '418 patent since at least August 26, 2019. Based on Globalfoundries' disclosures, Xilinx has also known or should have known since at least August 26, 2019 that its customers, distributors, and other purchasers of the '418 Accused Products are infringing the '418 patent at least because Xilinx has known that it is infringing the '418 patent.

45.     Other entities directly infringe the '418 patent by using, offering to sell, and/or selling the '418 Accused Products in the United States and by importing the '418 Accused Products into the United States.  For example, and as alleged more particularly below, Avnet, Inc. and Mouser have infringed and continue to infringe one or more claims of the '418 patent, including at least claim 27, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) and (g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '418 Accused Products.

46.     On information and belief, Mouser has infringed and continues to infringe one or more claims of the '418 patent, including at least claim 27, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(a) and (g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '418 Accused Products.  On information and belief, Mouser imports '418 Accused Products into the United States for sales and distribution to customers located in the United States, for example to its Texas location for shipping and distribution throughout the United States.  On information and belief, Mouser sells the '418 Accused Products in the United States. For example, Mouser sells '418 Accused Products through its website www.mouser.com.  On information and belief, Mouser offers the '418 Accused Products for sale in the United States. For example, Mouser engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.  In particular, Mouser has at least four sales branches across the United States.  Mouser also widely publicizes its distributor relationship with Xilinx, including maintaining stock of '481 Accused Products for shipping throughout the United States.

47.     Globalfoundries has suffered and continues to suffer damages as a result of Defendants' infringement of the '418 patent.

48.     Defendants' continuing acts of infringement are a basis of consumer demand for the '418 Accused Products.   Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to Globalfoundries, for which Globalfoundries has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.   The hardships that an injunction would impose are less than those faced by Globalfoundries should an injunction not issue.   The public interest would be served by issuance of an injunction.

## COUNT III
## INFRINGEMENT OF THE '986 PATENT

49.     Globalfoundries incorporates by reference the allegations set forth in paragraphs 1 through 48 as though fully set forth herein.

50.     On information and belief, Xilinx has directly infringed and continues to infringe and/or has induced infringement of one or more claims of the '986 patent, including at least claim 1, literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering to sell in the United States without authority or license, integrated circuits manufactured by TSMC using, for example, TSMC's 16 Nanometer technology and products containing these integrated circuits (collectively, the "'986 Accused Products"), in violation of 35 U.S.C. § 271.   The '986 Accused Products include at least field programmable gate arrays, including 3D ICs ("FPGAs"), adaptive compute acceleration platforms ("ACAPs"), and systems on a chip, including MPSoCs and RFSoCs ("SoCs"), such as the Xilinx XCKU3P and XCKU15P families of FPGAs, and other Kintex UltraScale+ FPGAs, fabricated using, for example, TSMC's 16 Nanometer process.

51.     On information and belief, Xilinx has directly infringed and continues to infringe at least claim 1 of the '986 patent literally or under the doctrine of equivalents, by importing into the United States, and/or using, and/or selling, and/or offering for sale in the United States, without authority or license, '986 Accused Products, in violation of 35 U.S.C. § 271(g).   On information and belief, Xilinx imports '986 Accused Products into the United States for sales and distribution to customers located in the United States.   On information and belief, Xilinx sells the '986 Accused Products in the United States.   For example, Xilinx provides direct sales through at least its bare die program and sells directly to original equipment manufacturers and electronic manufacturing service providers.   On information and belief, these direct sales include sales of '986 Accused Products in the United States.   On information and belief, Xilinx offers the '986 Accused Products for sale in the United States.   For example, Xilinx engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.   In particular, Xilinx has sales representatives in at least 47 states and sales offices throughout the United States.

52.     The '986 Accused Products are manufactured by a process including all of the limitations of at least claim 1 of the '986 patent.   Specifically, claim 1 of the '986 patent claims a method, comprising: forming a shared sacrificial gate structure above at least one first fin for a first type of FinFET device and at least one second fin for a second type of FinFET device, said second type being opposite to said first type; and forming a first sidewall spacer around an entire perimeter of said shared sacrificial gate structure in a single deposition process operation and a single etching process operation.

53.     The '986 Accused Products are made by a method.   Each is an integrated circuit fabricated using, for example, TSMC's 16 Nanometer semiconductor process.

54.     During the manufacture of the '986 Accused Products, a shared sacrificial gate structure is formed above at least one first fin for a first type of FinFET device and at least one second fin for a second type of FinFET device, said second type being opposite to said first type. TSMC's manufacture of the '986 Accused Products, in at least some instances, forms a gate above at least one first NMOS fin for an N-type FinFET device and at least one second PMOS fin for a P-type FinFET device, using a gate-last process.

55.     During the manufacture of the '986 Accused Products, a first sidewall spacer is formed around an entire perimeter of said shared sacrificial gate structure in a single deposition process operation and a single etching process operation.  TSMC's manufacture of the '986 Accused Products, in at least some instances, forms a sidewall spacer around an entire perimeter of said shared sacrificial gate structure, indicating single deposition and etch processes.

56.     On information and belief, the '986 Accused Products are neither materially changed by subsequent processes nor become trivial and nonessential components of another product.

57.     On information and belief, Xilinx actively, knowingly, and intentionally induces infringement of one or more claims of the '986 patent under 35 U.S.C. § 271(b) by actively encouraging others to import into the United States, and/or use, sell, and/or offer to sell in the United States, '986 Accused Products or products containing the infringing semiconductor components of the '986 Accused Products.  For example, Xilinx actively promotes the sale, use, and importation of the '986 Accused Products in marketing materials, technical specifications, data sheets, web pages on its website (e.g., www.xilinx.com), press releases, training tutorials, development and design tools, user manuals, and developer forums as well as at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES") and Xilinx

Development Forum) and through its sales and distribution channels that encourage infringing uses, sales, offers to sell, and importation of the '986 Accused Products. As another example, Xilinx representatives travel to customer sites in the United States for sales and support activity that includes working with customers to facilitate these customers' infringing testing, marketing, importation, and sales activity. On information and belief, Xilinx supplies customers with '986 Accused Products so that they may be used, sold, or offered for sale by those customers. For example, Xilinx provides direct sales to original equipment manufacturers and electronic manufacturing service providers. On information and belief, these direct sales include sales to customers in the United States. Certain Xilinx semiconductor components are compatible with standards specific to the United States such as Code Division Multiple Access ("CDMA") wireless standards, required primarily for compatibility with major carriers in the United States. In 2018, 2017, and 2016, Xilinx generated more net revenue from the United States than any other country. Xilinx additionally provides a wide range of technical support to customers, including product-specific solution centers and customer forums. Xilinx also promotes, publicly on its website, uses of the '986 Accused Products by customers in the United States.

58.    By at least August 26, 2019, Globalfoundries disclosed, by sending a letter and filing this Complaint, the existence of the '986 patent and identified at least some of Xilinx's and others' activities that infringe the '986 patent. Thus, based on this disclosure, Xilinx had knowledge of the '986 patent and that its activities infringe the '986 patent since at least August 26, 2019. Based on Globalfoundries' disclosures, Xilinx has also known or should have known since at least August 26, 2019 that its customers, distributors, and other purchasers of the '986 Accused Products are infringing the '986 patent at least because Xilinx has known that it is infringing the '986 patent.

59.     Other entities directly infringe the '986 patent by using, offering to sell, and/or selling the '986 Accused Products in the United States and by importing the '986 Accused Products into the United States.  For example, and as alleged more particularly below, Avnet, Inc. and Mouser have infringed and continue to infringe one or more claims of the '986 patent, including claim 1, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '986 Accused Products.

60.     On information and belief, Mouser has infringed and continues to infringe one or more claims of the '986 patent, including claim 1, literally or under the doctrine of equivalents at least under 35 U.S.C. § 271(g) by importing into the United States, and/or selling, and/or offering for sale in the United States, without any authority or license, at least some '986 Accused Products.  On information and belief, Mouser imports '986 Accused Products into the United States for sales and distribution to customers located in the United States, for example to its Texas location for shipping and distribution throughout the United States.  On information and belief, Mouser sells the '986 Accused Products in the United States.  For example, Mouser sells '986 Accused Products through its website www.mouser.com.  On information and belief, Mouser offers the '986 Accused Products for sale in the United States.  For example, Mouser engages in sales, marketing, and contracting activity in the United States and/or with United States offices of its customers.  In particular, Mouser has at least four sales branches across the United States.  Mouser also widely publicizes its distributor relationship with Xilinx, including maintaining stock of '986 Accused Products for shipping throughout the United States.

61.     Globalfoundries has suffered and continues to suffer damages as a result of Defendants' infringement of the '986 patent.

62.     Defendants' continuing acts of infringement are a basis of consumer demand for the '986 Accused Products.   Defendants' continuing acts of infringement are therefore irreparably harming and causing damage to Globalfoundries, for which Globalfoundries has no adequate remedy at law, and will continue to suffer such irreparable injury unless Defendants' continuing acts of infringement are enjoined by the Court.   The hardships that an injunction would impose are less than those faced by Globalfoundries should an injunction not issue.   The public interest would be served by issuance of an injunction.

### JURY DEMAND

63.     Plaintiff demands a jury trial as to all issues that are triable by a jury in this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief as follows:

(a)     Judgment that Defendants are liable for infringement and/or inducing the infringement of one or more claims of each of the Asserted Patents;

(b)     An Order permanently enjoining Defendants and their respective officers, agents, employees, and those acting in privity or in active concert or participation with them, from further infringement of the Asserted Patents;

(c)     Compensatory damages in an amount according to proof, including lost profits, and in any event no less than a reasonable royalty;

(d)     Pre-judgment interest;

(e)     Post-judgment interest;

(f)     Attorneys' fees based on this being an exceptional case pursuant to 35 U.S.C. § 285, including pre-judgment interest on such fees;

(g)     An accounting and/or supplemental damages for all damages occurring after any discovery cutoff and through final judgment;

(h)      Costs and expenses in this action; and

(i)      Any further relief that the Court deems just and proper.


Dated:  August 26, 2019                    Respectfully submitted,

                                           FARNAN LLP

                                           /s/ Brian E. Farnan
                                           Brian E. Farnan (Bar No. 4089)
                                           Michael J. Farnan (Bar No. 5165)
                                           919 N. Market Street, 12th Street
                                           Wilmington, Delaware 19801
                                           Telephone:  (302) 777-0300
                                           Facsimile:   (302) 777-0301
                                           bfarnan@farnanlaw.com
                                           mfarnan@farnanlaw.com

                                           *Attorneys for Plaintiff Globalfoundries U.S.
                                           Inc.*